IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REDDING RANCHERIA, | ) Case No. 11-1493 SC |
| Plaintiff, | ) |
| | ) ORDER RE: CROSS-MOTIONS FOR |
| v. | ) SUMMARY JUDGMENT |
| | ) |
| KENNETH SALAZAR, in his official | ) |
| capacity as the Secretary of the | ) |
| United States Department of the | ) |
| Interior, and LARRY ECHO HAWK, | ) |
| in his official capacity as the | ) |
| Assistant Secretary for Indian | ) |
| Affairs for the United States | ) |
| Department of the Interior, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**United States District Court**
For the Northern District of California

## I.   **INTRODUCTION**

This case is about an Indian tribe's efforts to build a new casino.  Plaintiff Redding Rancheria ("the Tribe") currently operates the Win-River Casino on its eight-and-a-half acre reservation in Shasta County.  The Tribe seeks to expand its gaming operations by building a second casino on 230 acres of undeveloped riverfront lands.  These lands, called the Strawberry Fields and the Adjacent 80 Acres (together, "Parcels"), are located a few miles outside the reservation.  The Parcels were purchased by the Tribe in 2004 and 2010, respectively, and the Tribe still holds them in fee.

///

**United States District Court**
For the Northern District of California

1    The United States Department of the Interior is authorized to

2    take title to lands in trust for Indian tribes or individuals.  It

3    is possible for tribes to conduct casino-style gaming on these

4    lands.  In 2010, the Tribe asked Interior to determine whether the

5    Parcels would be eligible for gaming if Interior was to take them

6    into trust.  Interior, acting through its Assistant Secretary for

7    Indian Affairs, Defendant Larry Echo Hawk, informed the Tribe that

8    they were not.  To make this decision, Interior relied on

9    regulations promulgated by the Secretary of the Interior

10   ("Secretary"), Defendant Kenneth Salazar.  In this lawsuit, the

11   Tribe challenges both the decision itself and the regulations on

12   which they were based.  ECF No. 1 ("Compl.").

13   The Tribe has moved for summary judgment and Interior has

14   filed a cross-motion.  ECF Nos. 17 ("Pl.'s MSJ"), 19 ("Defs.'

15   MSJ").  Both motions have been fully briefed.  ECF Nos. 21 ("Defs.'

16   Opp'n"), 22 ("Pl.'s Opp'n"), 23 ("Pl.'s Reply"), 24 ("Defs.'

17   Reply").  Interior has filed a certified copy of the relevant

18   administrative record.  ECF No. 14 ("AR").[1]  Having considered the

19   briefs and the administrative record, the Court concludes that the

20   matter is appropriate for decision without oral argument.  Civil

21   L.R. 7-1(b).  As set forth below, the Court GRANTS Interior's

22   cross-motion for summary judgment.

23   ///

24   ///

25   ///

26

27   [1] The Tribe stated in its Reply that it had filed a separate motion
28   to strike the administrative record.  Pl.'s Reply at 2 n.1.  That
     motion does not in fact appear on this case's docket and therefore
     the Court does not address it.

**United States District Court**
For the Northern District of California

## II.   BACKGROUND

Several different statutes set out the framework governing the United States' taking of land into trust for Indian gaming.  In light of this complexity, the Court first reviews the statutes central to resolving this case before turning to Interior's challenged decision and the underlying regulations.

### A.   Legal Background

On October 17, 1988, Congress passed the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701 et seq. ("IGRA").[2]  In doing so, it sought "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments" while at the same time "shield[ing] [Indian-operated gaming] from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players."  § 2702.

IGRA both "regulates gaming on Indian lands and restricts the lands upon which Indian tribes may conduct gaming." County of Amador v. U.S. Dep't of Interior, No. CIV. S-07-527 LKK/GGH, 2007 WL 4390499, at *2 (E.D. Cal. Dec. 13, 2007).  The regulation of gaming operations on Indian lands falls to the National Indian Gaming Commission ("NIGC"), an agency chartered by IGRA and "only nominally part of [Interior]." Id.  IGRA authorizes the NIGC to monitor and oversee gaming conducted by Indians, including by promulgating regulations. See § 2706(b)(10).  IGRA also provides

---

[2] Citations to the United States Code refer to Title 25 unless otherwise specified.

**United States District Court**
For the Northern District of California

the framework for determining on which lands Indians may conduct gaming. See §§ 2703(4), 2719. IGRA authorizes NIGC "to bring proceedings against Indian gaming facilities located on non-Indian land." N. Cnty. Cmty. Alliance, Inc. v. Salazar, 573 F.3d 738, 748 (9th Cir. 2009). IGRA also regulates gaming conducted on "Indian lands," which the statute defines as lands that are part of a tribe's reservation, § 2703(4)(A), and lands held in trust by the United States on behalf of an Indian tribe or individual, § 2703(4)(B). Thus, IGRA assumes the existence of a mechanism for determining which lands are "Indian lands" -- that is, reservation or trust lands.

IGRA itself does not authorize the government to impart reservation or trust status. That authority is found within the Indian Reorganization Act, which predates IGRA. 25 U.S.C. §§ 465, 467 ("IRA"). Section 465 of the IRA vests the Secretary of the Interior with discretionary authority to take land into trust "for the purpose of providing land for Indians." Section 467 permits the Secretary to declare and add to reservations. Only after lands are taken into trust or deemed reservations do they become "Indian lands" subject to IGRA. § 2703(4).

Section 2719 of IGRA sets forth a general prohibition against gaming on Indian lands taken into trust after the date of IGRA's passage, October 17, 1988 ("later-acquired lands"), unless specified exemptions or exceptions apply. The first exemption from the general prohibition, found in § 2719(a)(1), permits gaming on later-acquired lands if they are "within or contiguous to the boundaries of the reservation of the Indian tribe on October 17, 1988."

**United States District Court**
For the Northern District of California

This exemption plainly depends upon a tribe's having had a reservation on October 17, 1988.  However, many tribes had no reservation on that date because their reservations had been terminated during one of the periods of American history when the Federal government pursued a policy of Indian assimilation.  See City of Roseville v. Norton, 348 F.3d 1020, 1022 (D.C. Cir. 2003) (describing most recent period); County of Yakima v. Confederated Tribes and Bands of Yakima Indian Nation, 502 U.S. 251, 253-254 (1992) (previous periods).  In the 1950s this policy led the Federal government to sever its government-to-government relationship with many tribes and terminate their reservations. City of Roseville, 348 F.3d at 1022.  The Federal government has since repudiated this policy and some tribes have been restored, along with their reservations.  See id.  The plaintiff Tribe is one such restored tribe.  See AR at 6102-6111.

To "ensur[e] that tribes lacking reservations when IGRA was enacted [were] not disadvantaged relative to more established ones," Congress provided mechanisms by which restored tribes could be permitted to conduct gaming on later-acquired lands, notwithstanding IGRA's general prohibition.  City of Roseville, 348 F.3d at 1030.  These mechanisms take the form of "Exemptions" from the general prohibition, set forth at § 2719(a), and "Exceptions," set forth at § 2719(b).  This case turns on one of the Exceptions, § 2719(b)(1)(B)(iii) (the "Restored Lands Exception").  It provides that the general gaming prohibition does not apply to later-acquired lands if the "lands are taken into trust as part of . . . the restoration of lands for an Indian tribe that is restored to Federal recognition."  It was under this Exception that the Tribe

sought a determination from Interior as to whether the Parcels were eligible for gaming.

### B. __Factual Background__

In 1922, on behalf of the Tribe, the Federal government established a reservation of about 30 acres, the original Redding Rancheria.  See AR 5405-13 ("Decision")[3] at 1.  In 1965, the government withdrew the Tribe's federal recognition and terminated the reservation.  Id. at 1-2.  In 1984, the Tribe was restored to federal recognition.  Id. at 2.  Eight years later, in 1992, the United States took back into trust a portion of the original Rancheria comprising roughly 8.5 acres.  Id. at 2.  The Tribe currently operates the Win-River Casino on that land.  Id.

In 2004 and 2010, the Tribe bought the Parcels onto which it hopes to expand its gaming operation.  Pl.'s MSJ at ix-x.  The Parcels therefore are later-acquired lands for purposes of § 2719 and gaming may occur on these lands only if they fall within one of IGRA's Exemptions or Exceptions.

The Tribe seeks to set aside a decision rendered by Interior on December 22, 2010, in which Interior determined that the Parcels did not qualify for the Restored Lands Exception, based on regulations promulgated by the Secretary.  Decision at 7-8.  The regulations implementing the Restored Lands Exception are codified at 25 C.F.R. §§ 292.7-292.12 ("Regulations").[4]

The Regulations set forth conditions for qualifying for the Restored Lands Exception.  In short, the Restored Lands Exception only applies to a restored tribe's restored lands.  Interior does

---

[3] Further citations to the Decision use its internal page numbers.
[4] All further citations to the Code of Federal Regulations refer to Title 25.

**United States District Court**
For the Northern District of California

1   not dispute that the Tribe is a restored tribe.  Decision at 3-5.

2   Rather, Interior has determined that the Parcels are not "restored

3   lands" under the Regulations.  Id. at 5.

4       For a tribe that has been judicially restored to federal

5   recognition, as the plaintiff Tribe was, Interior will only deem

6   the tribe's later-acquired lands "restored" if the lands meet

7   criteria set forth in § 292.12.  See Decision at 5.  Section 292.12

8   requires restored tribes to show three kinds of connections to its

9   later-acquired lands: a modern connection, § 292.12(a); a

10  historical connection, § 292.12(b); and a temporal connection, §

11  292.12(c).  Interior found that the Tribe had demonstrated modern

12  and historical connections to the Parcels but had not demonstrated

13  the temporal connection required by § 292.12(c).  Decision at 5.

14  Section 292.12(c) requires a tribe to show that either

15      (1) The land is included in the tribe's first request for
        newly acquired lands since the tribe was restored to

16      Federal recognition; or
        (2) The tribe submitted an application to take the land

17      into trust within 25 years after the tribe was restored
        to Federal recognition and the tribe is not gaming on

18      other lands.

19

20  Interior determined that the Tribe could satisfy neither prong.

21  Decision at 7-8.  Interior determined that the Secretary had taken

22  newly acquired lands into trust for the Tribe at least twice

23  before, and that therefore the Tribe could not satisfy the "first

24  request" test of § 292.12(c)(1).  Id. at 7.  Interior also observed

25  that the Tribe already operated a gaming facility, and found on

26  that basis that the Tribe could not meet § 292.12(c)(2)'s

27  requirement of gaming on no "other lands."  Id. at 7-8.  Interior

28  accordingly informed the Tribe that the Parcels would not qualify

1   for the Restored Lands Exception if taken into trust.  Id. at 8.

2   This lawsuit followed.

3       C.  **The Tribe's Claims**

4       Because IGRA does not provide a private right of action, the

5   Tribe brings suit under the Administrative Procedure Act, 5 U.S.C.

6   § 701 et seq. ("APA").  The Tribe asserts five claims.  First, the

7   Tribe challenges the Secretary's authority to have promulgated the

8   Regulations.  Compl. ¶¶ 26-31.  The Tribe claims that IGRA vests

9   NIGC with "exclusive authority" to promulgate regulations.  Id. ¶

10  27.  Second, the Tribe asserts that the Regulations "impose[]

11  conditions for the restored lands determination that Congress never

12  intended and [that] conflict[] with judicial interpretations of

13  [IGRA]."  Id. ¶ 34.  Third, the Tribe asserts that the Regulations

14  violate IGRA by "limit[ing] the number of times that a tribe could

15  use an Exemption or Exception" and "mak[ing] the Exemptions and

16  Exceptions mutually exclusive."  Id. ¶ 42.  The third claim also

17  asserts that the Decision itself was arbitrary and capricious

18  because Interior failed to consider important arguments made by the

19  Tribe.  Id. ¶ 45.

20      The Tribe frames its first three claims as IGRA claims brought

21  under the APA.  The Tribe's fourth claim reframes the foregoing

22  allegations as violations of the APA itself.  See id. ¶¶ 49-54.

23  Lastly, in its fifth claim, the Tribe asserts that by rendering the

24  Decision unfavorably to the Tribe, Interior breached "a fiduciary

25  duty in the nature of a continuing trust obligation to assist the

26  Tribe in engaging and conducting gaming by interpreting the

27  provisions of the IGRA and the regulations promulgated thereunder

28  in favor of the Tribe and to the Tribe's benefit."  Id. ¶¶ 58-60.

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1   Both parties have moved for summary judgment on each claim.

2  Having found no genuine issues of material fact, the Court

3  determines that this case is suitable for summary judgment.

4

5  **III.  LEGAL STANDARD**

6       **A.     Summary Judgment**

7       Entry of summary judgment is proper "if the movant shows that

8  there is no genuine dispute as to any material fact and the movant

9  is entitled to judgment as a matter of law."  Fed. R. Civ. P.

10  56(a).  Summary judgment should be granted if the evidence would

11  require a directed verdict for the moving party.  Anderson v.

12  Liberty Lobby, Inc., 477 U.S. 242, 251 (1986).  Thus, "Rule 56[]

13  mandates the entry of summary judgment . . . against a party who

14  fails to make a showing sufficient to establish the existence of an

15  element essential to that party's case, and on which that party

16  will bear the burden of proof at trial."  Celotex Corp. v. Catrett,

17  477 U.S. 317, 322 (1986).

18       **B.     Administrative Procedure Act**

19       When the court reviews a government agency's final action, the

20  Rule 56 standard for summary judgment is amplified by 5 U.S.C. §

21  706(2) of the Administrative Procedure Act.  Title 5 U.S.C. § 706

22  provides the applicable standard of review for agency action.

23  Under § 706 of title 5, "the reviewing court shall decide all

24  relevant questions of law, interpret constitutional and statutory

25  provisions, and determine the meaning or applicability of the terms

26  of an agency action."  Under § 706(2) of title 5, the reviewing

27  court shall set aside agency action found to be "arbitrary,

28  capricious, an abuse of discretion, or otherwise not in accordance

1   with law" or "in excess of statutory jurisdiction, authority, or
2   limitations, or short of statutory right[.]"

3       "In making the foregoing determinations, the court shall
4   review the whole record or those parts of it cited by a party, and
5   due account shall be taken of the rule of prejudicial error."  5
6   U.S.C. § 706.  Summary judgment in a case of judicial review of
7   agency action requires the court to review the administrative
8   record to determine whether the agency's action was "arbitrary and
9   capricious, an abuse of discretion, not in accordance with law, or
10  unsupported by substantial evidence on the record taken as a
11  whole."  Environment Now! v. ESPY, 877 F. Supp. 1397, 1421 (E.D.
12  Cal. 1994) (citing Good Samaritan Hospital, Corvallis v. Mathews,
13  609 F.2d 949, 951 (9th Cir. 1979)).

14      "The court is not empowered to substitute its judgment for
15  that of the agency."  Citizens to Preserve Overton Park, Inc. v.
16  Volpe, 401 U.S. 402, 416 (1971), overruled on other grounds by
17  Califano v. Sanders, 430 U.S. 99, 105 (1977).  The Ninth Circuit
18  recognizes a narrow scope of review applicable to agency action:
19  "Assuming that statutory procedures meet constitutional
20  requirements, the court is limited to a determination of whether
21  the agency substantially complied with its statutory and regulatory
22  procedures, whether its factual determinations were supported by
23  substantial evidence, and whether its action was arbitrary,
24  capricious or an abuse of discretion."  Toohey v. Nitze, 429 F.2d
25  1332, 1334 (9th Cir. 1970), cert denied, 400 U.S. 1022 (1971).
26  Despite this narrow scope of review, the court is still expected to
27  make a "thorough, probing, in-depth review" of the administrative
28  record to ensure the validity of the agency action and "must

consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  Overton Park, 401 U.S. at 415-16.

### C.   Canons Relevant to Indian Law

"In reviewing an agency's interpretation of a statute governing Indian tribes, the court must also consider canons of construction relevant to Indian law."  Oregon v. Norton, 271 F. Supp. 2d 1270, 1275 (D. Or. 2003).  One such canon counsels that "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit."  Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 766 (1985).  However, this canon has no application where a statute is unambiguous.  See Negonsott v. Samuels, 507 U.S. 99, 110 (1993).  Moreover, in the Ninth Circuit, when a court reviewing a statute governing Indian tribes discerns an ambiguity that would, under Chevron U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837 (1984), require the court to defer to the agency's construction of the statute, "the liberal construction rule must give way to agency interpretations that deserve Chevron deference . . . ."  Williams v. Babbitt, 115 F.3d 657, 663 n.5 (9th Cir. 1997); see also Seldovia Native Ass'n, Inc. v. Lujan, 904 F.2d 1335, 1342 (9th Cir. 1990).

### IV.  DISCUSSION

### A.   The Secretary Possessed the Requisite Authority to Promulgate the Regulations

The Tribe asserts that the Secretary had no authority to promulgate the Regulations, that the Regulations are therefore ultra vires and void, and that the Decision, which applied the

11

**United States District Court**
For the Northern District of California

1   Regulations, must be set aside.  See Pl.'s MSJ at 30.  The thrust

2   of the Tribe's argument is that IGRA authorizes the NIGC, and only

3   the NIGC, to promulgate regulations implementing IGRA generally and

4   § 2719 specifically.  Id. at 24-25; Compl. ¶¶ 26-31.  The Tribe

5   rests this argument on § 2706(b)(10), which provides, in full, that

6   NIGC "shall promulgate such regulations and guidelines as it deems

7   appropriate to implement the provisions of this chapter."

8        Interior counters that this grant of authority to NIGC is, by

9   its plain language, non-exclusive.  Defs'. MSJ at 10.  Interior

10  argues that Congress clearly intended the Secretary's power to

11  promulgate regulations under 25 U.S.C. §§ 2 and 9 and 5 U.S.C. §

12  301 to extend specifically to IGRA.  See id. at 15-16; Defs.' Opp'n

13  at 6.  According to Interior, Congress's grant of regulatory

14  authority to NIGC "creates, at most, an ambiguity as to whether the

15  Secretary also possesses authority to promulgate regulations under

16  the IGRA," and urges the Court to give Chevron deference to the

17  Secretary's determination that he does have such authority.  Id. at

18  17 (citing Chevron, 467 U.S. at 843).

19       Chevron directs a court reviewing an administrative agency's

20  construction of a statute it administers to undertake a two-step

21  analysis.  See Chevron, 467 U.S. at 842-43.  In step one, the court

22  determines "whether Congress has directly spoken to the precise

23  question at issue. If the intent of Congress is clear, that is the

24  end of the matter; for the court, as well as the agency, must give

25  effect to the unambiguously expressed intent of Congress."  Id.

26  But if the court identifies an ambiguity or interpretive gap in the

27  statute, the court proceeds to Chevron's second step.  In step two,

28  the court's sole inquiry is whether the challenged agency decision

**United States District Court**
For the Northern District of California

1  "is based on a permissible construction of the statute." Id. at

2  843.  In this inquiry, an agency interpretation will survive unless

3  it is "procedurally defective, arbitrary or capricious in

4  substance, or manifestly contrary to the statute." United States

5  v. Mead Corp., 533 U.S. 218, 227 (2001).

6       Applying Chevron principles here, the Court agrees with

7  Interior that § 2706(b)(10)'s grant of regulatory authority to NIGC

8  is non-exclusive and that Congress unambiguously intended to

9  authorize the Secretary to promulgate regulations interpreting §

10  2719.  IGRA was passed against the backdrop of the Secretary's

11  existing authority to take lands into trust for Indian tribes and

12  to declare and add to their reservations pursuant to IRA §§ 465 and

13  467.  The Secretary possesses general authority to promulgate

14  regulations in the exercise of these land-into-trust powers.  See 5

15  U.S.C. § 301 (general grant of authority to heads of executive

16  Departments); 25 U.S.C. § 9 (authorizing President to make

17  regulations relating to Indian affairs); id. § 2 (giving Secretary

18  oversight of "management of all Indian affairs"); see also Santa

19  Rosa Band of Indians v. Kings County, 532 F.2d 655, 665 (9th Cir.

20  1975) (recognizing Secretary's authority to promulgate regulations

21  reasonably related to specific statutory responsibilities).  The

22  Secretary has in fact promulgated such regulations.  E.g., 25

23  C.F.R. Part 151.  The only question, then, is whether IGRA changed

24  or limited the Secretary's land-into-trust powers in some fashion.

25  When Congress passed IGRA, it spoke directly to this question.

26  IGRA's § 2719(c) states: "Nothing in this section shall affect or

27  diminish the authority and responsibility of the Secretary to take

28  land into trust."

The Tribe's reading of IGRA plainly would affect and diminish the Secretary's authority to take land into trust, for it would carve out part of the Secretary's general authority to promulgate regulations governing land-into-trust determinations and transfer it to the NIGC.  This result would be out of keeping with both § 2719(c) and the overall legislative scheme presented here.  Where Congress meant to transfer the Secretary's authority to NIGC, it did so.  See § 2711(h) ("The authority of the Secretary . . . relating to management contracts . . . is hereby transferred to [NIGC].").  With respect to the Secretary's land-into-trust authority, it did just the opposite by expressly preserving that authority in § 2719(c).  It is true that § 2706(b)(10) permits NIGC to promulgate regulations.  However, it does not follow that the Secretary lacks such authority, especially in light of the statutory framework here, where the Secretary is responsible for determining whether to take land into trust for any purpose, including gaming, while the NIGC regulates gaming only.

Section 2709 tends to confirm this reading: it specifies that until the NIGC is organized and promulgates regulations, the Secretary shall continue to exercise his pre-IGRA authority "relating to supervision of Indian gaming . . . ."  In other words, IGRA transferred to NIGC that portion of the Secretary's authority relating to the supervision of Indian gaming, and only that portion.  The act of taking land into trust is not included in the "supervision of Indian gaming," if for no other reason than that land may be taken into trust on behalf of Indian tribes for a variety of purposes, of which gaming is only one.  Section 2709 provides additional confirmation that, just as Congress intended

**United States District Court**
For the Northern District of California

for NIGC to supervise Indian gaming, it intended for the Secretary to retain his pre-IGRA power to promulgate regulations for taking land into trust.

"Indeed, when a court recently determined that the Secretary did not enjoy a broad delegation of power under IGRA, Congress quickly corrected that misapprehension." Oregon, 271 F. Supp. 2d at 1277.  In Sac and Fox Nation of Missouri v. Norton, the Tenth Circuit held that NIGC had exclusive authority to interpret IGRA. 240 F.3d 1250, 1265 (10th Cir. 2001).  From this premise, the Tenth Circuit proceeded to determine that the Secretary had overstepped his bounds by interpreting IGRA's exemption for reservations, § 2719(a)(1).  Id.  Within the year, Congress overturned the Tenth Circuit's decision and, by implication, the premise upon which it was based.  Congress clarified that IGRA delegated to the Secretary, not NIGC, the authority to "determine whether a specific area of land is a 'reservation' for purposes of sections 2701-2721 . . . ."  Pub. L. No. 107-63, § 134 (2001); see also Oregon, 271 F. Supp. 2d at 1278.  The NIGC therefore cannot possess, as the Tribe claims, "exclusive" authority to interpret § 2719.  The Tribe does not point to any persuasive reason why Congress would have endorsed the Secretary's authority concerning § 2719(a) while withholding the same authority with respect to § 2719(b)'s closely similar provisions.

Alternately, if this Court were to hold, as the Tribe urges, that the Secretary has the authority to "interpret" the Exemptions but not to promulgate regulations giving those interpretations prospective effect, it would force the Secretary to make each land-into-trust determination on an ad hoc basis -- but only if the

**United States District Court**
For the Northern District of California

1   land-into-trust application concerned lands earmarked for gaming.

2   In all other cases, the Secretary would be free to promulgate and

3   apply regulations.  Such a result cannot be squared with § 2719(c),

4   with the overall legislative scheme, or with common sense.  Cf. FDA

5   v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132-33 (2000).

6        The Tribe cites IGRA's "repeated reference to the Secretary"

7   as "unmistakable evidence that Congress was aware of the

8   Secretary's role in taking land into trust and chose not to grant

9   to him any more authority than it expressly did."  Pl.'s Opp'n at

10  5.  This is correct as far as it goes, but it fails to acknowledge

11  just how much authority Congress expressly granted.  The Tribe

12  reads each of IGRA's references to the Secretary as an express

13  grant of authority which necessarily excludes other powers.  See

14  id. at 3-5, Pl.'s MSJ at 27-28.  But § 2719(c) is not an express

15  grant of authority; it is an express reservation of authority.  It

16  expressly reserves the Secretary's preexisting power to make land-

17  into-trust transfers, which includes the power to promulgate

18  regulations binding the Secretary and his subordinates in the

19  exercise of that power.

20       The Tribe insists that IGRA, as a later and more specific

21  statute, trumps the earlier, general grants of authority upon which

22  the Secretary relied when promulgating the Regulations.  Pl.'s MSJ

23  at 25-27.  This argument assumes, incorrectly, that IGRA conflicts

24  with those earlier statutes; as explained above, IGRA preserves the

25  powers that the earlier statutes grant.  The Tribe also argues that

26  the Secretary had no authority to promulgate the Regulations

27  because "Federal courts interpreting § 2 and § 9 have repeatedly

28  found that those statutes, standing alone, do not provide

sufficient authority to allow the Secretary to promulgate

regulations."   Id. at 27.   This argument is unavailing because the

Secretary did not rely on "those statutes, standing alone."  He

relied on those statutes standing alongside § 2719.  73 Fed. Reg.

29354; see Santa Rosa Band of Indians, 532 F.2d at 665 ("[N]either

[§ 2 or § 9] grants general regulatory powers to the Secretary of

the Interior; to be valid a regulation must be reasonably related

to some other specific statutory provision.").  Finally, the Tribe

cites liberally to a Fifth Circuit case warning courts of the

dangers of finding implied delegations of agency authority.  See,

e.g., Pl.'s Opp'n at 3, 5 (citing Texas v. United States, 497 F.3d

491, 502-03 (5th Cir. 2007)).  Texas is well-reasoned but

inapposite here.  Texas addressed the Secretary's promulgation of

regulations pursuant to his role in the tribal gaming compact

approval process.  That role originated with IGRA and, as the Texas

court noted, gives the Secretary minimal discretion.  See 497 F.3d

at 503.  As such, it is clearly distinguishable from the

Secretary's preexisting role as the United States' conduit for

taking land into trust for Indian tribes, a role in which the

Secretary must exercise substantial discretion.

For the foregoing reasons, the Court holds that the

Secretary's general regulatory authority, coupled with § 2719,

empowered the Secretary to promulgate regulations interpreting and

applying § 2719.[5]  Therefore, with respect to the first claim, the

---

[5] Because the Court finds that Congress unambiguously authorized
the Secretary to promulgate the Regulations, it need not look to
Interior's own construction of IGRA.  Nevertheless, the Court notes
that its understanding of NIGC's role is consistent with pre-
litigation positions taken by NIGC itself.  See AR at 6586-90 (Jan.
9, 2009 decision of NIGC to follow the Regulations); id. at 6726
(Nov. 12, 2010 Memorandum of Agreement between Interior and NIGC,

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1  Court GRANTS Interior's cross-motion for summary judgment.

2      **B.**  **The Regulations Are Substantively Permissible**

3      The Tribe also challenges the substance of the Regulations

4  themselves, under IGRA through the APA (second claim and third

5  claim in part) and under the APA itself (fourth claim in part).

6  The Tribe regards the Restored Lands Exception as unambiguous and

7  claims that the Regulations impermissibly impose conditions on

8  land-into-trust determinations not found in § 2719 itself.  The

9  Tribe further argues that these conditions run afoul of Federal

10  court decisions interpreting IGRA, Interior and NIGC's previous

11  interpretations of IGRA, and Congressional intent to promote gaming

12  by the Tribe.  The Tribe also asserts that the Regulations impose

13  impermissible limitations on a tribe's ability to avail itself of

14  both § 2719(a)'s Exemptions and § 2719(b)'s Exceptions.[6]  Interior,

15  on the other hand, argues that the Restored Lands Exception is

16  ambiguous and that the Regulations rest on a permissible

17  construction of its terms and therefore are owed <u>Chevron</u> deference.

18  For the reasons set forth below, the Court agrees with Interior.

19      **1.**  **The Restored Lands Exception Is Ambiguous and**

20          **Therefore Interior's Interpretation Commands <u>Chevron</u>**

21          **Deference**

22      Section 2719(b)(1)(B)(iii) does not define the term

23  "restoration of lands" and the term is susceptible to multiple

24  ——————————————————————————————

25  stating: "When the Secretary acquires land into trust for gaming,
   [Interior] and NIGC agree that the Secretary decides whether a
26  tribe meets one of the exceptions in 25 U.S.C § 2719 . . . .").

27  [6] As detailed in Section IV.B.3 <u>infra</u>, the Tribe initially framed
   this argument as one that the Regulations were unreasonable because
   they made the Exceptions and Exemptions "mutually exclusive."  The
28  Tribe later qualified this view.  <u>Compare</u> Compl. ¶ 42 <u>and</u> Pl.'s MSJ
   at 18-19 <u>with</u> Pl.'s Reply at 4.

**United States District Court**
For the Northern District of California

1   meanings.  See Oregon, 271 F. Supp. 2d at 1277 (citing Confederated

2   Tribes of Coos, Lower Umpqua & Siuslaw Indians v. Babbitt, 116 F.

3   Supp. 2d 155, 162 (D.D.C. 2000)).  Additionally, neither reading

4   IGRA as a whole nor reading the Restored Lands Exception in the

5   context of the larger statutory scheme reveals a way to ascertain

6   which lands are restored lands for the purposes of §

7   2719(b)(1)(B)(iii).  The Restored Lands Exception is therefore

8   ambiguous.

9       Having discerned an ambiguity in the statute, the Court must

10  ascertain how to apply Chevron deference in light of the Blackfeet

11  Tribe presumption requiring liberal construction of ambiguous

12  statutes to benefit Indians.  The Court first notes that as

13  recently as 2003 the Ninth Circuit declined to consider exactly

14  this question, leaving it "for another day."  Navajo Nation v.

15  Dep't of Health and Human Servs., 325 F.3d 1133, 1136 n.4 (9th Cir.

16  2003).  Navajo Nation went only so far as to highlight the tension

17  between Ninth Circuit cases indicating that the Blackfeet Tribe

18  presumption must yield to Chevron deference and out-of-circuit

19  cases taking the opposite view.  Id.  This Court must follow Ninth

20  Circuit precedent and therefore would apply the Ninth Circuit rule

21  (that Blackfeet Tribe yields to Chevron) if it were to determine

22  that the choice between Chevron or Blackfeet Tribe principles would

23  change the outcome of this case.  But the Court need not reach that

24  question, because it determines instead that this case does not

25  implicate Blackfeet Tribe.  As explained below, the ambiguity of

26  the Restored Lands Exception does not lead to one potential reading

27  that benefits Indians and another potential reading that does not.

28  The ambiguity leads to a reading that could favor one set of

**United States District Court**
For the Northern District of California

Indians relative to another, if not for regulations balancing their respective interests.  Under these circumstances, the <u>Blackfeet Tribe</u> presumption has no force because it gives no guidance as to which set of Indians the Restored Lands Exception should benefit.  Because the Court determines that <u>Blackfeet Tribe</u> does not apply here, it finds no conflict in this case between <u>Blackfeet Tribe</u> and <u>Chevron</u>.

> **2.    The Regulations Rest on a Permissible Construction of the Restored Lands Exception**

Applying <u>Chevron</u> principles, the Court must read the Restored Lands Exception's lack of definition of "restoration of lands" as a gap left by Congress for Interior to fill in with regulations.  <u>See Chevron</u>, 467 U.S. at 843-44.  This Court's inquiry, then, is limited to whether the Regulations rest on a permissible construction of § 2719.  <u>Id.</u> at 843.  The Court determines that they do.

The Restored Lands Exception provides that IGRA's general prohibition of gaming on Indian lands acquired after October 17, 1988 "will not apply when . . . lands are taken into trust as part of . . . the restoration of lands for an Indian tribe that is restored to Federal recognition." § 2719(b)(1)(B)(iii).  Because the Restored Lands Exception does not define "the restoration of lands," it contains no limiting principle.  That is, it is amenable to a reading that would allow restored tribes, and only restored tribes, to conduct gaming on any and potentially all lands that they acquire after their return to federal recognition.  <u>Cf.</u> <u>Grand Traverse Band of Ottawa & Chippewa Indians v. U.S. Att'y for the W. Dist. of Mich.</u>, 198 F. Supp. 2d 920, 934-35 (W.D. Mich. 2002)

**United States District Court**
For the Northern District of California

1   ("Grand Traverse"), aff'd, 369 F.3d 960 (6th Cir. 2004) (rejecting

2   interpretation that would impose one kind of limitation on meaning

3   of "restoration of lands" but suggesting other kinds).  Tribes

4   which never had their government-to-government relationship severed

5   and their reservations terminated, and thus never needed to be

6   restored, would not have the same ability to conduct gaming on

7   later-acquired lands.  Cf. id. at 934.  Whether Congress passed

8   IGRA affirmatively to "promote" Indian gaming, Pl.'s Reply at 2, or

9   merely to authorize it, Grand Traverse, 198 F. Supp. 2d at 933, it

10  is far from clear that in doing so Congress intended to advantage

11  restored tribes relative to other tribes.  On the contrary, § 2719

12  embodies a policy of promoting parity between restored and other

13  tribes.  See City of Roseville, 348 F.3d at 1030 ("[T]he exceptions

14  in IGRA § [2719](b)(1)(B) serve purposes of their own, ensuring

15  that tribes lacking reservations when IGRA was enacted are not

16  disadvantaged relative to more established ones.").

17      It is not for this Court to ascertain the proper balance

18  between, on the one hand, IGRA's authorization of Indian gaming as

19  a means of promoting tribal self-sufficiency and economic

20  development, and, on the other, IGRA's promotion of parity between

21  restored and other tribes -- a balance which must account for the

22  particular histories of different tribes and their lands, the

23  sensitivities of the various communities where tribes may seek to

24  game, and the competing interests of federal, state, and tribal

25  sovereigns.  Congress committed the resolution of that delicate and

26  highly technical question to Interior when it withheld from IGRA

27  any clear way of determining which restored lands are eligible for

28  gaming.  Cf. Chevron, 467 U.S. at 844.  Accordingly, the Court may

**United States District Court**
For the Northern District of California

1   not disturb the Regulations unless they constitute an unreasonable

2   accommodation of IGRA's conflicting policies or "not one that

3   Congress would have sanctioned." Id. at 845.

4       The Tribe claims that Congress would not have sanctioned the

5   Regulations because they impose conditions on the Restored Lands

6   Exception that are not present in the text of § 2719(b)(1)(B)(iii)

7   itself. Pl.'s MSJ at 6-13. But, of course, the imposition of

8   conditions not found in the statutory text is not, by itself,

9   inconsistent with a Congressional delegation of authority to

10  interpret a statute. In other words, delegation depends on

11  agencies articulating detailed conditions that implement a

12  statute's general provisions. The principle put forward by the

13  Tribe would limit agencies to parroting the statutory text.

14  Delegation, and Chevron, assume that agencies will apply criteria

15  not found on the face of the statute.

16      The Tribe also asserts that the Regulations conflict with

17  prior judicial constructions of the Restored Lands Exception. See

18  Pl.'s MSJ at 19-23. Even assuming arguendo that this were true, it

19  would not demonstrate that the Regulations run contrary to the

20  manifest intent of Congress. "A court's prior judicial

21  construction of a statute trumps an agency construction otherwise

22  entitled to Chevron deference only if the prior court decision

23  holds that its construction follows from the unambiguous terms of

24  the statute and thus leaves no room for agency discretion." Nat'l

25  Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967,

26  982 (2005). As the Tribe acknowledges, Pl.'s MSJ at 22-23, the

27  relevant construction comes from Grand Traverse. The Grand

28  Traverse court did not hold that its construction followed from the

1  unambiguous terms of the Restored Lands Exception.  See 198 F.

2  Supp. 2d at 934-37.  On the contrary, Grand Traverse appeared to

3  recognize the ambiguity of the term "restoration" in §

4  2719(b)(1)(B)(iii)'s phrase "restoration of lands."  See id. at 935

5  ("Given the plain meaning of the language, the term 'restoration'

6  may be read in numerous ways . . . .").  Grand Traverse did not

7  foreclose Interior's discretion to promulgate regulations

8  inconsistent with it and the Tribe points to no holding that would.

9      **3.    Neither Interior's Decision to Promulgate the**

10          **Regulations nor the Regulations Themselves Are**

11          **Arbitrary and Capricious**

12      The Tribe takes Interior to task for changing its own

13  definition of restored lands.  In doing so, the Tribe acknowledges

14  that a change of position, by itself, would not invalidate the

15  Regulations.  Pl.'s MSJ at 23, Pl.'s Reply at 9; see also Brand X,

16  545 U.S. at 981, FCC v. Fox TV Stations, Inc., 129 S. Ct. 1800,

17  1810-11 (2009) ("Fox TV").  Rather, the Tribe argues that Interior

18  may not change positions "without a reasoned explanation for the

19  change" and that "the level of deference to the agency's revised

20  interpretation is not the same as that of a first interpretation."

21  Pl.'s Reply at 9.  The Court cannot endorse the second argument

22  because it disregards recent guidance from the Supreme Court which

23  clarifies that an agency "need not always provide a more detailed

24  justification than what would suffice for a new policy created on a

25  blank slate."  Fox TV, 129 S. Ct. at 1811.  Fox TV makes it clear

26  that Chevron deference applies in either case.  See id. at 1810-11.

27      The first argument, that Interior inadequately explained its

28  reasons for changing positions, bears more extended discussion.

United States District Court
For the Northern District of California

The focus of judicial inquiry when an agency changes its position is whether either the change itself or the newly adopted position is arbitrary and capricious.  See id.; Brand X, 545 U.S. at 981. Normally, but not always, this standard requires agencies to explain their changes in position.  Fox TV, 129 S. Ct. at 1811. The agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are better than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better, which the conscious change of course adequately indicates."  Id.  Under this standard of review, a court must presume the validity of agency action "and should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  Providence Yakima Medical Center v. Sebelius, 611 F.3d 1181, 1190 (9th Cir. 2010).

Of course, the Court only need reach this issue if Interior changed policy in the first place.  The Tribe strenuously asserts that Interior did.  See, e.g., Pl.'s MSJ at 19-23.  Interior does not squarely address the point, though language in their briefing can be read to admit it.  Defs. Opp'n at 16.  The Court perceives Interior's change as nothing more than a shift from case-by-case application of the temporal limitation suggested by Grand Traverse to a rule-based application of the temporal limitation.  Compare Grand Traverse, 198 F. Supp. 2d at 935-37 (inventing temporal limitation and then, without explicit reference to any set criteria, determining that lands were "part of the first systematic effort to restore tribal lands") with § 292.12(c) (establishing bright-line rules).  The Court declines to hold that such a change

**United States District Court**
For the Northern District of California

1   or the Regulations themselves are arbitrary and capricious.

2        The preamble to Interior's final rule promulgating the

3   Regulations provides ample evidence of rational and conscious

4   decision-making that is consistent with the purposes of IGRA.  <u>See</u>

5   73 Fed. Reg. 29,354-74 (May 20, 2008).  Interior stated that it

6   imposed the temporal limitation to "effectuate[] IGRA's balancing

7   of the gaming interests of newly acknowledged and/or restored

8   tribes with the interests of nearby tribes and the surrounding

9   community." <u>Id.</u> at 29367.  Interior demonstrated that in doing so

10  it had contended with prior court decisions, its own previous

11  public statements of policy, and an array of comments submitted by

12  the public.  <u>See id.</u> at 29,365-66.  Moreover, Interior's stated

13  purpose for promulgating the Regulations evinced a permissible

14  intent to clarify its policies and impose consistency on its future

15  determinations.[7]  <u>See id.</u> at 29,354.  These reasons suffice.  <u>See</u>

16  <u>Mayo Found. for Med. Educ. & Research v. United States</u>, 131 S. Ct.

17  704, 715 (2011) (upholding bright-line rule because agency

18  "reasonably concluded" it would "improve administrability" and

19  "avoid[] the wasteful litigation and continuing uncertainty that

20  would inevitably accompany any purely case-by-case approach").

21  ///

22  

---

23  [7] The Tribe contends that this was not Interior's true motivation
    and that Interior actually intended the Regulations to "address the
24  then current controversy concerning off-reservation gaming and, in
    particular, the fear of state and local government officials and
25  citizen's groups of alleged reservation shopping" -- a fear which,
    according to the Tribe, was about to result in Congressional
26  amendment of § 2719.  <u>See</u> Pl.'s Opp'n at 9-10.  The Tribe does not
    show how this would be impermissible, even if true.  <u>See</u> <u>Fox TV</u>,
27  556 U.S. at 1815-16 ("The independent agencies are sheltered not
    from politics but from the President, and it has often been
28  observed that their freedom from presidential oversight (and
    protection) has simply been replaced by increased subservience to
    congressional direction.").

United States District Court
For the Northern District of California

The Tribe strenuously argues that no clarification or further assurance of consistency was required because NIGC and Interior had "applied the same interpretation of the Restore[d] Lands Exception for more than a decade before the Regulations were promulgated, a period in which the Secretary made decisions on dozens of trust acquisition applications." Pl.'s MSJ at 8. But of course the Tribe is not the one who determines whether the Regulations were a necessary or advisable means of implementing the ambiguous Restored Lands Exception. Neither is this Court. See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) ("[A] court is not to substitute its judgment for that of the agency.") Congress entrusted that determination to Interior. Cf. Heckler v. Campbell, 461 U.S. 458, 467 (1983) (refusing to "require [an] agency continually to relitigate issues that may be established fairly and efficiently in a single rulemaking proceeding").

At the core of the Tribe's case is its argument that the Regulations are unreasonable because the manner in which they limit gaming is incompatible with Congressional intent. The Tribe initially argued that the Regulations impermissibly rendered the Exemptions set forth at § 2719(a) and § 2719(b)'s Exceptions mutually exclusive. Compl. ¶ 42; Pl.'s MSJ at 18-19. The Court understands the Tribe's position to have evolved somewhat: it has backed off from the view that the Exemptions and Exceptions are, strictly speaking, mutually exclusive, and instead argues that the Regulations unreasonably impose a sequential and numeric limitation on a restored tribe's exercise of the Exemptions and Exceptions. See Pl.'s Reply at 4. That is, after a restored tribe first has

**United States District Court**
For the Northern District of California

later-acquired lands taken into trust for gaming purposes, the availability of Exemptions or Exceptions for other lands will depend on which Exemption or Exception the restored tribe used for the first trust acquisition, with the result that restored tribes generally will be able to game only on the first parcel taken into trust for gaming. <u>See id.</u> ("Because of the order in which the Tribe sought to have land taken into trust, the Regulations prevent the Tribe from having land taken into trust under both the Restored Lands Exception and the On-Reservation Exemption.")  The Tribe asserts that such a limitation "is unquestionably a violation of IGRA, which . . . explicitly includes the Restored Lands Exception and the On-Reservation Exemption as separate, independent bases for having land taken into trust for gaming purposes . . . ."  <u>Id.</u>

Nevertheless, § 2719 nowhere "explicitly" provides that each Exemption and Exception is a "separate, independent" basis.  At best, § 2719 implies that.  The interplay of the statute's Exceptions and Exemptions is ambiguous, and so the Court must defer to Interior's construction unless it is manifestly unreasonable or contrary to Congressional intent.  <u>State Farm</u>, 463 U.S. at 43.  The Tribe has not shown that it is.

Interior does not, as the Tribe suggests, violate IGRA simply by imposing extensive restrictions on the taking of land into trust for gaming.  As discussed in Section IV.A <u>supra</u>, the questions before Interior in applying § 2719 were how to limit the definition of "restoration of lands" (not whether to do so) and how to balance the concerns of restored and other tribes (not whether to promote tribal economic development at all).  These questions have been committed to Interior by Congress and the Court cannot say that the

Regulations fail to address them reasonably.

The Court GRANTS Interior's cross-motion for summary judgment on the Tribe's second claim and on the third and fourth claims to the extent they challenge the substance of the Regulations.

### C. The Decision Was Not Arbitrary and Capricious.

The Tribe's third and fourth claims challenge, in part, the Secretary's application of the Regulations, the former under IGRA through the APA and the latter under the APA directly. The Tribe asserts that Interior arbitrarily and capriciously failed to consider important arguments and information when making the Decision. E.g., Pl.'s MSJ at 30-34. Interior replies that it did not fail to consider the arguments, but rather did not need to reach them in order to render the Decision. Defs.' MSJ at 26-27. The Court agrees with Interior.

At the root of the Tribe's contention is the Decision's discussion of two arguments the Tribe made in support of its application to have the Parcels taken into trust for gaming. The first argument is that the lands on which the Win-River Casino is located "did not constitute 'restored land' or 'newly acquired lands' for the purposes of the Restored Lands Exception analysis" because they had been taken into trust before October 17, 1988 and because they were located within the boundaries of the Tribe's original reservation. Pl.'s MSJ at 31 (citing AR 6093-6120). The second argument is that certain lands were not "newly acquired lands" within the meaning of § 292.2 because, when the United States most recently took them into trust, they had merely been returned to the trust status they enjoyed before the United States terminated the Tribe's reservation, rather than coming under the

1    Tribe's control for the first time.  Id. (citing AR 6150-57).

2       Interior addressed these arguments thus:  "The Tribe asserts

3    that the trust-to-trust transfers giving the Tribe its first trust

4    holdings in 1992 should not be considered newly acquired land, as

5    the land was already held by the Secretary in trust before October

6    17, 1988.  I do not have to reach that issue."  Decision at 7.

7    Interior explained:

8         Whether we consider the Tribe's first request for newly
          acquired lands to be the trust-to-trust transfers or the
9         subsequent fee-to-trust requests [for a Head Start site
          and a tribal burial ground, described in the Decision's
10        Background section], it is evident that the subject
          Parcels were not included in either of those requests.
11        Therefore, the Parcels were not "included in the
          [T]ribe's first requests for newly acquired lands since
12        the [T]ribe was restored to Federal recognition, and they
          cannot meet the standard in 25 C.F.R. § 292.12(c)(1).
13

14

15    Id. (quoting § 292.12(c)(1)).  The Secretary then explained that

16    the Tribe could not satisfy the alternate criterion for

17    establishing a temporal connection to newly acquired lands, which

18    depends on a tribe conducting gaming on no other lands, see §

19    292.12(c)(2), because the Tribe already operated the Win-River

20    Casino.  See id.

21       The Court sees nothing arbitrary or capricious about this

22    application of the Regulations.  The Tribe's real objection to the

23    Decision appears to be not how Interior applied the Regulations but

24    rather that Interior applied them at all.  The Tribe criticizes the

25    Decision on the ground that "no provision of § 2719 . . . supports

26    the conclusion that the Exemptions and Exceptions listed in §

27    2719(a) and (b) are mutually exclusive."  Pl.'s MSJ at 32; see also

28    Pl.'s MSJ at 13 (noting that before Decision was made Tribe raised

United States District Court
For the Northern District of California

objections to Regulations based on Tribe's reading of § 2719).  But of course the requirements of § 2719 were not before Interior when it rendered the Decision.  The requirements of the Regulations implementing § 2719 were.  The Court refuses to determine that the Decision was arbitrary and capricious because it unerringly applied Regulations with which the Tribe disagrees.

The Tribe, relying on Butte County v. Hogen, 613 F.3d 190 (D.C. Cir. 2010), suggests that the Decision simply provides too little explanation.  But Butte County actually establishes the Decision's adequacy.  The Butte County court explained that the APA requires agencies to provide a "brief statement of the grounds for denial of the party's request."  613 F.3d at 194 (internal quotation marks omitted).  The eight-page Decision did so, as discussed above.  See Decision at 7-8.  "The agency's statement must be one of reasoning; it must not be just a conclusion; it must articulate a satisfactory explanation for its action."  613 F.3d at 194 (internal quotation marks omitted).  The Decision clearly satisfies this standard, too.  See Decision at 7.  A reasoned determination that an issue need not be reached because other issues are dispositive is not, by itself, an arbitrary and capricious failure to consider arguments and evidence.

The Court GRANTS Interior's cross-motion for summary judgment on the Tribe's third and fourth claims to the extent they are based on Interior's asserted misapplication of the Regulations.  This disposes of the third and fourth claims in their entirety.

///

///

///

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   **D.   The Decision Did Not Violate Any Fiduciary Duty**

2   **Putatively Owed by the Secretary to the Tribe**

3         The Tribe's fifth and final claim asserts that, by issuing the

4   Decision, the Secretary breached a fiduciary duty owed to the

5   Tribe.  The Tribe identifies this duty as "a continuing trust

6   obligation to assist the Tribe in engaging and conducting gaming by

7   interpreting the provisions of the IGRA and the regulations

8   promulgated thereunder in favor of the Tribe and to the Tribe's

9   benefit."  Compl. ¶ 58.  The Tribe does not point to any specific

10  statutory provision that would impose this duty on the Secretary.

11  Rather, the Tribe asserts that because "a trust relationship exists

12  between the United States and the Tribe with respect to its

13  Reservation lands" -- not, notably, with respect to the Parcels --

14  "the Secretary's conduct in interpreting the IGRA and promulgating

15  the Regulations must be evaluated in accordance with his role as

16  trustee . . . ."  Pl.'s Opp'n at 15.

17        The argument lacks merit.  The United States "assumes Indian

18  trust responsibilities only to the extent it expressly accepts

19  those responsibilities by statute."  United States v. Jicarilla

20  Apache Nation, 131 S. Ct. 2313, 2325 (2011).  And IGRA "does not

21  create a fiduciary duty; it is a regulatory scheme that balances

22  the competing interests of the states, the federal government and

23  Indian tribes."  Lac Courte Oreilles Band of Lake Superior Chippewa

24  Indians of Wisconsin v. United States, 259 F. Supp. 2d 783, 790

25  (W.D. Wis. 2003).  Moreover, "the United States never acquired the

26  subject land in trust for [the Tribe].  Without a trust, there is

27  no fiduciary duty."  Id.  Because IGRA does not impose an

28  enforceable trust responsibility on the Secretary and the Secretary

is not a trustee for the Tribe with respect to the Parcels, there simply was no fiduciary duty for the Secretary to breach.

The Court GRANTS Interior's cross-motion for summary judgment on the Tribe's fifth claim.[8]

V.   **CONCLUSION**

For the foregoing reasons, the Court GRANTS the cross-motion for summary judgment brought by Defendants Kenneth Salazar and Larry Echo Hawk in their official capacities as, respectively, Secretary of the United States Department of Interior and Assistant Secretary for Indian Affairs for the United States Department of the Interior.  Accordingly, the Court DENIES Plaintiff Redding Rancheria's motion for summary judgment.  Interior's determination that the Parcels do not qualify for the Restored Lands Exception and therefore are ineligible for gaming remains undisturbed.

IT IS SO ORDERED.

Dated: February 16, 2012

_____
UNITED STATES DISTRICT JUDGE

IT IS SO ORDERED

Judge Samuel Conti

---

[8] Interior objected to declarations that the Tribe submitted with its Motion.  Defs. Opp'n at 21-24.  Because the Court has disposed of the case without relying on the declarations, Interior's objection is DENIED AS MOOT.

United States District Court
For the Northern District of California